35979.   OVERSTREET *v.* RHODES *et al.*

DECIDED NOVEMBER 16, 1956—REHEARING DENIED DECEMBER 5, 1956.

*Wm. G. Grant, Robert W. Spears,* for plaintiff in error.

*Fisher, Phillips & Allen, T. Charles Allen,* contra.

NICHOLS, J. The judgment of this court was reversed by the Supreme Court in *Overstreet* v. *Rhodes,* 212 *Ga.* 521 (93 S. E. 2d 715). In *Overstreet* v. *Rhodes,* 93 *Ga. App.* 422 (91 S. E. 2d 863), this court ruled that where the tenant in this case pleaded that the untenantability of the premises alone constituted a constructive eviction and there was no demurrer to such plea, the question of whether the evidence authorized the finding that in addition to the untenantability of the premises the mak-

ing of repairs would unreasonably interrupt the business of the tenant was not raised by the general grounds of a motion for a new trial or by a motion for a judgment notwithstanding the verdict based on a motion for a directed verdict, the only ground of which was that the evidence demanded a finding for the plaintiff (and contained no reference to the insufficiency of the plea). The Supreme Court ruled that the question whether repairing would unreasonably interrupt the occupancy of the tenant was raised by the motion for a new trial and by the motion for a judgment notwithstanding the verdict with directions as above stated. There was no evidence introduced in the case directed at the specific proposition of what effect repairing the premises would have. The case was tried on the theory that untenantability of the premises alone constituted a constructive eviction. See *Lewis & Co.* v. *Chisholm,* 68 *Ga.* 40. The court so charged the jury and there was no exception to the charge. Notwithstanding these facts the mandate of the Supreme Court requires that we pass on the additional question. The evidence as to the condition of the building which throws any light on this additional question is as follows:

W. C. Rhodes testified in his own behalf as defendant in part as follows: "At the time this surface water had undermined the bakery floor back there in March, the roof was leaking, too. In fact, the roof has leaked continuously for ever since, oh—I mean they patched it. They would come out and do a little bit of patching every time we would call them. I think this was in June, 1952. Mr. Sachs was walking down the street from over next door down there, and I called him in. He came in the shop and I had one of these apple bins sitting on top of one of my light fixtures where water was dropping and I had a mixing bowl that big sitting on top of the flour in back where tar had run down there, and water. In answer to this complaint when Mr. Sachs looked at this condition in 1952, he sent a man out to patch it. No, I mean they came out there—I think two fellows worked on the roof. They took some gravel—It did not altogether stop the leaks. In fact, while they put it up there, some tar poured through the roof when they were working on the roof. The tar leaked through the roof where there was water leaking. There's no ceiling in the back part of the building. The only

thing you have up there is your rafters, sheathing, tar paper and gravel and tar on it. You can look right up and see the sheathing part of the roof. There's no ceiling to catch it. If there was any ceiling up there, it would have caught the tar, but anything that comes through comes into the back part of the bakery. We called Mr. Sachs and made known to him the fact that it hadn't been properly repaired. . . In June, 1953, it began to give us a great deal of trouble again. . . At that time the roof was leaking something terrible; the roof was in bad shape then. I did not tell Mr. Sachs about the roof in 1953. I showed him the outside but I didn't tell him about the roof. . .

"In June, 1953, the roof sheathing was rotted out and you could see in three places and if you had got up there—in fact, we got up on top of the ladies' toilet and you could take something and stick up in the wood in that sheathing. I don't know how thick it is, an inch or what, but all the places that had leaked, you could stick something up in the wood part and you needed a whole new sheathing in there before you put a roof on it. Yes, the condition of that roof sheathing was pointed out to Mr. Sachs in June of 1953. He sent a man out to put a roof on it in August, 1953. The man came out to put the whole new roof on and we called him in the back and showed him and said, 'We don't believe you can put a roof on top of this sheathing, it's liable to fall in on us.' He said, 'Well, I'll check it,' and he did check it. When he got up walking on it, the gravel and all would drop down in the building. All they did was scrape off the gravel, put new tar paper over it and new tar and gravel back over it. Not a thing was done to the wood sheathing that was underneath the gravel and the tar paper. Not one board was taken out and put a new one in. As to whether or not we complained of that condition to Mr. Sachs and whether or not he had had opportunity, and had come out there and looked at it, Mr. Sachs had seen it; he had been out there and looked at it. We gave notice to Mr. Sachs before he even began to let this fellow put this gravel on it. We did and even had the man, before he would go to work on it, we had him call Mr. Sachs about the sheathing before we let him do any work on it and he didn't replace one board in the whole roof. . . After the roof had been completely finished in the last of August or first part of September,

we had a 4-foot light hanging over a bench where we iced our cakes and decorated the cakes. The fluorescent light was hanging up over there and this whole thing fell out, the board and all, pulled right out after they finished with the roof; about 4½ feet of board and the whole light fell down, if anybody had been working there where that bench had been, it could have hurt them and would have ruined everything on the table. It was rotten."

G. E. Rhodes, Jr., testified in his own behalf as defendant in part as follows: "The fixture fell from the building after we moved out; but as far as the roof, the roof is—to the eye is rotten in spots. The boards are rotten in spots; you can see it. We could see it before we moved out. They turned black. The roof was painted white and those spots turned black. Yes, to the eye those boards were rotten. Some of them dropped down that far. . . . I actually examined the roof physically. As to how did I examine it, at one time we were having it painted and we were up at the rafters right at the roof. When I got up there I felt it. I have been on top of the roof. In August, 1953, when the tar and gravel and tar paper were put on the roof there were men walking around on the roof at that time. They had to get up there to put the tar and gravel on it. When these men were up there on the roof putting this tar and gravel on, they did not move and replace any of the wooden roof sheathing. I was there when that condition was called to the attention of Mr. Sachs that they weren't doing it. I was in the building when they were up there on the roof. While they were putting this tar and gravel on, well, they scraped—you would find some of the scrapings would fall down through the cracks in the sheathing and when they put the new tar on there, some of the tar even dripped down between the cracks in the sheathing. The man who was putting on this roof in 1953, the first part of September, was sent there by Mr. Sachs."

G. E. Rhodes, Sr., testified as a witness for the defendants in part as follows: "As to whether or not I had an occasion to make an examination of the wood roof sheathing, you didn't have to make an examination; it was right in front of your eyes. The best part of the back of the roof, the sheathing, all the wood proper, that was honeycombed, it was rotten and you could take

a pencil in several places and stick it right up in that wood. I told Mr. Sachs that he would have to put in new sheathing on there before he put a new roof. I showed it to him and pointed it out to him and he never made any remarks whether he would do it or whether he wouldn't do it. As to how long after that conversation was it before he sent a fellow out to put the tar and gravel on the roof, then he was to put a new roof on and he came in there, he was tending to the work over next door and he came down there about 8 o'clock—well, he was down there several mornings, but I met him and he says, 'Mr. Rhodes, I'm going to put a new roof on your place shortly.' I told him, 'Come in here; I want to show you before you put new paper and tar and stone on that roof, you better fix this sheathing or wood roof. You see it up there, rotten.' There was a place over the table was rotten, another place up higher near the front partition was rotten. I said, 'It's liable to fall in if you don't do it.' And he didn't do it. He didn't put a beam of wood under there. He had men go up there with a shovel and scrape the gravel off the tar paper and he pulled it down to the back and then he put some tar paper on the old roof and put tar and taken these old gravel and scattered them over the roof. That's the new roof they put on it."

Earnest H. Stewart testified as a witness for the defendant in part as follows: "My name is Earnest H. Stewart. My occupation is a building inspector, City of Atlanta. I have been so engaged in that profession approximately 8 years. My duties as a building inspector for the City of Atlanta entail the enforcement of the ordinances, laws and regulations pertaining to buildings and their conditions and their safety and pertinent conditions thereto. . . In October, 1953, I had an occasion to make an inspection of a building out on Piedmont Avenue used by the Rhodes Bakery; approximately, I would say, October or November, 1953—sometime. . . As to what I found from my inspection, what my determination was of that building, what the physical condition of it was, the roof sheathing was in some— I would say several—places deteriorated considerably more or less in small places, individual timbers, I would say. And there was one occasion where the light fixture had pulled the timber out of the roof itself and fell to the floor. . . From my exami-

nation of the condition of the building I arrived at a conclusion as to whether the building was safe for occupancy at that time, and I made a notification on my findings to the landlords. The carbon copy of a letter marked defendant's Exhibit 1 is my notification to the owner of my findings on that building. The conclusion that I came to after an examination of that building as to the condition of the building was that the deficiencies as pointed out in the letter should be corrected before the building was reoccupied. As to whether in my opinion at that time did I feel that the building was unsafe for occupancy in the condition in which I found it, the building as a whole was definitely not unsafe. There was, however, isolated risks in persons being in the building subject to another timber falling from the roof. I have testified the building as a whole was not unsafe, that is correct, I testified that there were some isolated spots in the ceiling that had rotted out; that is correct. I got up on something where I could be close to the roof and examine it and I looked up at it and saw it. I had an instrument with a long handle I could reach the roof in several places and found some soft boards. As to how many boards I would estimate there were in the roof, possibly 4 or 5. As to construction of that roof, the size of the boards in it, how the roof is held up and exactly what the composition of the roof is on that building, the framework in the roof is, I believe is metal, either metal or wood trusses, I mean, supported from one wall to the other. They are approximately $3\frac{1}{2}$ or 4 feet apart. And they are decked over the top of that with 2-inch timbers. I think the timbers are tongue and groove, which is like your ordinary floor; one fits into the other. When I say '2-inch', I mean two inches of thickness. The boards are 8 inches wide, I think, 8 inches is standard. Of the four or five boards that apparently had rotted, just sections of them had rotted. I have testified a light fixture had fallen; I don't know how it came to be on the floor, except part of the wood was still fastened to the hangers of the fixture. The piece of wood still fastened to it was as long as the approximate distance between two of the supporting members of the roof; approximately four feet. As to whether or not there was any danger of the roof falling, the roof as a whole, no, sir. In my estimation no danger of the roof falling. . . As to whether that building

was unsafe for occupancy, as I previously stated, isolated spots in the building was unsafe; the building as a whole is structurally safe."

Edward W. McClure testified as a witness for the defendant in part as follows: "My name is Edward W. McClure. My occupation is building; building contractor. I have been associated with the building field since 1935 except for two periods of active duty in the Marine Corps. I have done some repair work, mostly in new buildings, in residential construction. I am familiar with a building located at 1580 Piedmont Avenue, the Rhodes Bakery building. I have been in that building over a period of time. I have had an occasion to make an examination of that building recently. The last time I was on the premises of that building and inside that building was this morning between 8:30 and 9. I had an opportunity to observe and examine the inside of that building out there. . . I had an opportunity to examine and observe the roof sheathing out there on the inside of that building this morning. The roof sheathing is—as near as I could determine, it's by material laid across on beams. The material was painted and the majority of the paint has been—is scaling off due to moisture or poor paint. Some of the boards are sagging between the roof girders; a portion of the boards, or some of the boards, show evidence of mold, which is an indication of moisture being there or having been there. Against the back wall, the concrete or the brick wall, I found this morning there that a number of boards were rotten and I had the opportunity to get up and examine the boards more closely and was able to push a pencil through the boards and pulverized decayed wood came out. As to whether I am able to arrive at any estimate of the length of time this decay had existed from my observation of the boards there, without moisture being present, it would take years for wood to decay in that fashion. It would take several years for wood to decay in that fashion. There was some indication that a new roof had been put on, that tar had dripped down between the cracks in the roofing boards. And I noticed one board there that was a different color, and indication that perhaps that board had been replaced in the past. That board was located, roughly, just in front going toward the front of the store from the skylight and to the north side. There was nothing

attached to that particular board. There were fluorescent light fixtures in the building. The light fixtures were attached directly to the roof sheathing. As to what my opinion is as to the safe or unsafe condition of that roof sheathing as I examined it this morning, seeing the condition of the boards inside the building, I would be hesitant myself in getting on top of the roof to walk around on it for fear of falling through those rotten spots. My opinion as to the safety or unsafety condition of people going inside that building, the danger of anything falling is there would be a slight chance of boards falling if additional load was put on the roof above it. . . As to whether there is any danger, in my opinion, of the entire roof falling, with additinal load on the roof, yes. There could be a snow load, ice load or something like that. With ice and snow I think portions of it might fall. As to how much load would I think it would take, I weigh 200 and I think I could go through portions of that now. 200 distributed over the area of my feet. I found 8 or 10 rotten holes in that roof. I would estimate there are maybe 1800 boards in that roof, between the roof studs. . . I was out there approximately half an hour this morning making this examination. As to how I tested these 8 or 10 boards I said I found rotten, there was a ladder there and I went up the ladder and actually used a pencil to poke into the wood, into the boards where they looked like they were rotten, and in that space of time I poked into 8 or 10 boards. As to whether or not I made a minute examination of every board up there, no, I did not; along the back wall and a portion of the side wall."

Considering the nature of the business of the tenant and the defects in the premises which the jury would have been authorized to find existed, we are of the opinion that the jury was authorized to find that the repairing of the premises would have unreasonably and materially interfered with the operation of the bakery and the general occupancy and use of the rented premises. In this view the court did not err in denying the motion for new trial and the motion for a judgment notwithstanding the verdict.

*Judgments affirmed.  Gardner, P.J., Townsend, Carlisle and Quillian, JJ., concur.  Felton, C.J., dissents.*

FELTON, C. J., dissenting. In my opinion the evidence is inconclusive on the question as to what effect the repairing of the

premises would have had on the occupancy of the tenant, and that it would not have authorized a finding that repairing the premises would have unreasonably interfered with the occupancy of the tenant.